## WEST TEXAS UTILITIES CO. v. HENDERSON.

### No. 8753.

Court of Civil Appeals of Texas. Austin.

March 8, 1939.

Rehearing Denied March 29, 1939.

W. A. Wright, of San Angelo, and Wagstaff, Harwell, Wagstaff & Douthit, of Abilene, for appellant.

C. C. Crocker, D. B. Hardeman, and R. G. Hughes, all of San Angelo, for appellees.

McCLENDON, Chief Justice.

This is the second appeal of this case which is primarily one of boundary. See Tex.Civ.App., 106 S.W.2d 370. We shall endeavor, as far as practical, to avoid reiteration of the evidence adduced on the first trial; referring to the former opinion in this regard, and pointing out wherein evidence in the second trial differed substantially from that on the first.

Appellee (plaintiff below) holds the record title to the Peter Kendall survey, for which he sued appellant. The latter holds the record title to the senior surveys 171 (Peter Duffy) and 643 (Jacob Schmidt). Appellant also asserted title under the five and ten years statutes of limitation, Vernon's Ann.Civ.St. arts. 5509, 5510. The boundary issue hinges upon whether 171 and 643 have a common boundary (See map 106 S.W.2d page 371). If so the Kendall conflicts with the senior surveys 643 and 171, and appellant's record title must prevail. The trial was to a jury upon a single special issue, under which the jury found "that the forked pecan tree referred to in the evidence as being about $91\frac{1}{2}$ varas west of a stone mound on the bank of the Concho river," was "not the pecan tree described in the original field notes of the Peter Duffy survey No. 171, at the call for its northwest corner." The court declined to submit the issue of limitation. The judgment was for appellee for title

and possession of the Peter Kendall survey.

As we view the record two issues control the appeal: (1) Whether 171 and 643 have a common boundary as a matter of law; and (2) whether the evidence supported appellant's plea of limitation, either conclusively or factually.

There are three points of difference in the evidence upon the two trials:

1. In the first trial the original field notes as copied in the statement of facts showed that survey No. 172 (J. F. Fusch) was surveyed by J. S. McDonald. This was shown to be an error. The survey was made by J. G. McDonald who surveyed 171 and a number of other surveys noted below, in all of which (except 180) he used the same chain carriers.

2. In the first trial the evidence was confined to the area delineated by surveys 171, 172, 643 and the Peter Kendall; whereas in the second trial the evidence took a much wider range.

3. In the first trial the tree which appellant contends is the original bearing tree called for in the field notes of 171 and 172 as marking their common river corner (N. W. 171 and N. E. 172) was referred to by Mr. Goodfellow as a forked cottonwood 56 inches in diameter. In the second trial it was admitted that this tree was in fact a pecan, and that Mr. Goodfellow's testimony in this regard was an inadvertent error. The evidence on the second trial raised the fact issue whether the tree was old enough to be the original bearing tree. Since we are not called upon to review the evidence on this point factually, it will only be necessary to state, that the witnesses widely differed in their evidence both as to the size and age of the tree, the stump and one prong of which were still standing. It was approximately properly located, and otherwise fitted the description in the original field notes, to mark the common corner at the point claimed by appellant. Appellant's witnesses gave its size at the base as 56 inches in diameter, and its age as more than one hundred years. Appellee's witnesses differed as to both size and age; the former ranging from 28 to 36 inches in diameter, and the latter from 80 to 90 years. The jury accepted appellee's version, which for our present purposes we accept. However, this does not eliminate the corner which the tree is claimed to mark as the true original common corner

of 171 and 172; for the very obvious reason that the original tree may have been washed away by heavy floods that are known to be common on this stream; and the tree in evidence grown up in the immediate vicinity.

■ Other than the issue as to the age of this tree, the evidence is without material conflict. From it we have reached the conclusions that it demonstrates that 171 and 172 have a common corner; that this corner is located substantially at the point claimed by appellant; that the east line of 643 is a projection south of the east line of 172 and is coincident with the west line of 171. This of course eliminates any vacancy between 171 and 643, which vacancy is essential to the validity of the Peter Kendall. These conclusions we base upon what follows:

Photostatic copies of the original field notes of surveys 163 to 172 inclusive were introduced in evidence. Surveys 163 to 171 had a north frontage on the Concho river. Each called to begin at the river at a point marked by one or more pecan bearing trees; thence S., W., and N. to a point on the river similarly marked; thence down the river to the beginning. The southern corners were marked only by "a stake and mound." 163 was surveyed April 9, 1853. 164, 165, 166, 170, and 171 were surveyed April 10, 1853, and were certified by J. G. McDonald, Deputy Surveyor, Bexar District. 167, 168, and 169 bore the notation, "Surveyed April 10, 1853," but with a heavy line drawn through the notation, and were certified by J. S. McDonald, July 4, 1856. The same chain carriers (Jose Morales and Jesus Garcia) were used in all these surveys, 163 to 171, inclusive. The surveys were laid out from east to west in regular numerical order; each higher number calling to begin on the river at the N. W. corner of the next preceding lower number for its N. E. corner, giving the same bearings for that corner. 172, containing only 418½ acres under a certificate calling for 640 acres, was certified by J. G. McDonald, August 26, 1856; no date for the actual survey was given, but the same chain carriers were used as in 162–171 inclusive. The manner of making this survey will be given later. Certified copies of the original field notes of Surveys 174 to 180, inclusive, were also introduced. These were all surveyed by J. G. McDonald. All but 180 were surveyed April

10, 1853, and the same chain carriers as in 163–172 were used. 180 was surveyed April 11, 1853, and different chain carriers were used. 643 was certified by J. S. McDonald, July 1, 1856, using different chain carriers from those used in 163–179. No date of this survey is given.

Before discussing apparent discrepancies in dates it should be noted that all of these surveys were in the Fisher and Miller colonies, the statute governing which did not require that the certificate issue prior to the actual survey. Chap. 52, p. 54, Gen.Laws 3rd. Leg.; 3 Gammel's Laws, p. 492; Pasch.Dig. Arts. 193 and 194; White v. Holley, 3 Tex.Civ.App., 590, 24 S.W. 831, 833. From the opinion in this case we quote: "Plaintiff in error contends that as this survey was made by a deputy surveyor in 1847, and the certificate was not issued to Fisher & Miller until August 23, 1851, the survey thus made was void. We do not concur in this opinion. Whatever may have been the law governing ordinary surveys and locations, such was not the law governing surveys and locations in Fisher & Miller's colony. On the contrary, it was made the duty of the surveyor in the Bexar land district to make the surveys, and furnish the land office with a map thereof. The commissioner of the land office was required to furnish a similar map to the commissioner appointed to issue certificates, and upon these maps the land selected was to be noted. Pasch.Dig. art. 924. The holder of the certificate designated to the commissioner issuing the certificate the tract of land he wanted, and the commissioner was required to attach to the certificate a description of the section of land thus selected, having due regard to the provision of the law relative to alternate sections. Id. art. 923."

Appellee contends that 172 could not have been surveyed prior to February 3, 1854 (3 Gammel's Laws, p. 1479), because the certificate under which the survey was awarded was issued May 13, 1854, which recited that it was issued under an act of the Legislature of February 3, 1854. This act, however, was merely supplemental to the above act of 1850 (3 Gammel's Laws, p. 493), extending to March 1, 1855, the time limit (18 months after May 1, 1850) for granting and obtaining certificates under the act of 1851. We quote the body of this act in full:

"Section 1. Be it enacted by the Legislature of the State of Texas, That the time for issuing land certificates to those entitled in the above recited act, be extended to the first day of March, A. D. eighteen hundred and fifty-five.

"Sec. 2. That the Commissioner of said Colony, to be appointed after the passage of this act, be appointed and issue certificates for land in the same manner and under the same regulations as required by the act approved January twenty-first, eighteen hundred and fifty, to which· this is a supplement. And that the certificates issued under the provisions of this act and the act to which this is a supplement, shall be located, surveyed and patented the same as other floating certificates in the said colony of the German Emigration Company, otherwise called the colony of Fisher & Miller.

"Sec. 3. That this act take effect and be in force from and after its passage."

The following facts point irresistibly to the conclusion that 167–169 were surveyed at the same time as 166 and 170 and by the same surveyor, J. G. McDonald. We have already noted that these surveys are laid out in regular numerical order from east to west, each higher number calling to begin for its N. E. corner at the N. W. of the immediately preceding lower number, with the same bearings. It also appears from the photostatic copies that the field notes proper including the numbers of the surveys, as well as the survey numbers at the beginning of the instruments, are all in the same handwriting. J. G. McDonald's signature was appended to the certificate on each. The middle initial (G) in the signature to the certificates to 167–169 appears to have written over it the capital letter S; while the date (April 10, 1853) has as stated, a heavy line drawn through it in each of these three instruments. What actually happened seems quite obvious from these facts: 166–171 were all made at the same time, and the field notes written up and certified by J. G. McDonald. 167–169 were selected later by colonists whose certificates were not issued until March 22, 1854; after which the remaining blanks were filled in, the survey dates lined out, in order not to antedate the certificates and the act of 1854, and J. S. McDonald wrote his middle initial over that of J. G. McDonald.

It also seems obvious that surveys 163–171 and 174–180 were made by meander-

ing the river to get their requisite widths and the northings of their river corners; and that the remaining portions of the surveys made by projection from these corners. As testified in the case, and as seems quite apparent, it would have been a physical impossibility to survey all these lines on the ground in the time noted in the field notes.

The S. W. corner of 172 (N. W. 643) is conceded by all to be established on the ground. Nor is there any serious question as to the location of the east line and N. E. corner of 643. If we eliminate the tree referred to in the verdict as an original bearing tree, all original bearing trees between the S. W. corner of 172 and the N. E. corner of 168 have long since disappeared. This is also true of N. E. 168, but that corner was established in 1886 by Deputy County Surveyor U. G. Taylor, who located from it the C. F. Potter survey. At that time the original bearing trees for that corner were reported as still standing. We regard this corner and the 167–168 common boundary line as established. Between this line and the corner marked by the disputed tree, there is (according to appellee's witness Simpson) an excess of 475 varas over the called width (950 varas each) of the four surveys 168–171, or an average excess of 119 varas each. Simpson gave each of these surveys its called width of 950 varas, thus throwing the west line of 171, 475 varas east of the east line of 643. The effect of this location of these surveys would necessarily result either in throwing the east line of 172, 475 varas east of the east line of 643; or create a vacancy of 475 varas between 171 and 172. Neither of these theories is tenable, for reasons that follow:

171 and 172 were surveyed by the same surveyor, using the same chain carriers, and (as we think the evidence clearly shows) at approximately the same time. 172 calls to begin for its N. E. corner at the N. W. corner of 171, giving the identical bearing tree. The date of the survey is not endorsed on the original field notes; but the body of these field notes including the number of the survey, and its number at the top of the document appear to be in the same handwriting as those of 168–171. The certificate to the field notes was dated August 29, 1856, two months later than the certificate to the field notes of 643 (July 1, 1856), a concededly junior

survey, and calling to begin at 172 N. W. corner, "Thence East with South line of said survey 650 varas (the called length of 172's S. line) to a stake and mound its S. E. corner." Manifestly the date to the certificate to the field notes of 172 does not throw any light upon the date the survey was actually made. Nor is the date 643 was surveyed given; but it must have been some time prior to July 1, 1856.

We turn now to the manner in which survey 172 manifestly appears to have been made. In the left hand upper corner of the original field notes is a plat of the survey made by the surveyor. This plat follows:

It will be observed that this survey appears to have been very carefully made, due no doubt to the fact that its entire north and west lines are formed by the South Concho and Main Concho rivers. The area is given as 418½ acres. The entire survey was divided into five strips running east and west; and these in turn were divided into five rectangles and six triangles. The river front was meandered in accordance with these triangles, beginning at the S. W. corner, as follows: Thence down South fork with its meanders as follows: North 333 vrs.—West 350 varas (River); North 396 varas West 200 vrs. (River); North 432 vrs. West 150 vrs. (River); North 350 varas West 80 varas (Mouth of South fork); Thence down Main Concho with its meanders as follows: East 480 varas North 549 varas the River. South 80 varas East 950 varas to the place of beginning.

The distance from the mouth of South fork to the east line of the survey (480+ 950=1430 varas) accords, within a few varas of the actual distance on the ground

between the mouth of the South fork and the east line of the survey as contended by appellant and as fixed by its south line (650 varas) measured from its established S. E. corner. These facts establish, we think, with practical certainty, not only that this survey and all its exterior lines were actually made on the ground, but that it was made with reasonable accuracy and there is no appreciable excess between its east line and the mouth of the South fork. There is one other circumstance strongly pointing to this conclusion. 643 was surveyed within a relatively short time after 172. It calls to begin for its N. W. corner at the S. W. corner of 172, giving the identical bearings: "Thence East with South line of said survey 650 varas to a stake and mound its S. E. corner." Its east line calls for 1,750 varas to the river. As already stated the east line of 643 is now established, and its position (650 varas E. of the recognized corner of 172) is conceded by all parties to this suit. There is no reasonable basis under which the east line of 172 can be thrown farther east than the east line of 643. Nor is there any reasonable basis under which a vacancy can be created between 172 and 171; and this regardless of the actual date the former was surveyed. They were both surveyed by the same surveyor with the same chain carriers; and 172 called for the N. W. corner of 171, giving the identical bearing tree.

In the light of the above evidence, all transpiring in a very short time in the early 1850's, we can give no refuting effect to the fact that the Land Office some thirty years later (1886) recognized a vacancy of 180 varas between 643 and 171. This recognition appears to have resulted from two manifest errors in surveying: One by the surveyor of the McNeese in 1883, who calls for two south corners of 643, one of these on the river and the other 160 varas east of that point; and the other by the surveyor of the Peter Kendall in 1887, who places the east line of the Peter Kendall 20 varas west of the recognized N. W. corner of the McNeese, thus giving the Kendall its width of 180 varas, 20 of which are in conflict with 643. This latter was admitted on the first trial (see first paragraph of our former opinion). It is to be noted in this connection that the Land Office map of 1892, which shows this vacancy, filled in by the Kendall, gives

171 and 172 a common boundary, thus throwing the east line of 172, 180 varas east of the east line of 643. As already stated there is no reasonable hypothesis upon which such location can be given to the east line of 172.

 As stated, the trial court declined to submit the issue of limitations under either the five or ten years statutes. These issues were raised by the pleadings and special issues calling for their submission were seasonably requested and refused. Under our above holding these issues become immaterial. However, in view of the practice recently applied by the Supreme Court in Lane v. Community Natural Gas Co., 123 S.W.2d 639, we have carefully examined the evidence in this regard and have reached the conclusion that it was sufficient to support a jury finding upon the issue of the ten years statute. We do not regard it of that conclusive character as to warrant a directed verdict in favor of appellant.

The trial court's judgment is reversed and judgment is here rendered for appellant.

Reversed and rendered.

BAUGH, J., not sitting.